UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

PETERS BROADCAST                    )
ENGINEERING, *also known as* Peters  )
Broadcast Engineering Inc.,          )
                                     )
        Plaintiff,                   )    Case No. 1:22-cv-00236-HAB-SLC
                                     )
v.                                   )
                                     )
24 CAPITAL, LLC, *et al.*,            )
                                     )
        Defendants.                  )

## REPORT AND RECOMMENDATION

Before the Court is a motion for default judgment and supporting documents filed by

Plaintiff Peters Broadcast Engineering, also known as Peters Broadcast Engineering Inc.

("PBE"), pursuant to Federal Rule of Civil Procedure 55, asking that the Court issue a judgment

in its favor and against Defendants 24 Capital, LLC ("24 Capital") and Jason Sankov (together

"Defendants"). (ECF 27, 27-1 to 27-4). The District Judge referred this matter to the undersigned

Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local

Rule 72-1. (ECF 28). Subsequently, the undersigned issued an Order (ECF 34) directing Plaintiff

to establish whether service of process had been completed. For the following reasons, I FIND

that service of process is satisfactory as to Defendant Sankov but not Defendant 24 Capital, and I

recommend that Plaintiff's motion be DENIED.

## I. SERVICE OF PROCESS

### A. Procedural Background

Plaintiff initiated this lawsuit on July 15, 2022 (ECF 1), as a class action with a seven-

count complaint, in which it asserted a federal claim under the Racketeer Influenced and Corrupt

Organizations ("RICO") Act and state-law claims of intentional misrepresentation, fraud, disgorgement, misappropriation of name and goodwill, breach of contract, and a violation of Ohio Revised Code § 1703.003, naming 24 Capital, Sankov, and "John Does" as Defendants. (ECF 1). With its complaint, Plaintiff submitted proposed summons for "24 Capital Funding, LLC," "Mark Allayer,"[1] and Defendant Sankov (ECF 1-2 to 1-4), and summons were issued accordingly on July 25, 2022 (ECF 5). However, on October 26, 2022, Plaintiff submitted additional proposed summons for "24 Capital, LLC," "Mark Allayev," and Sankov (ECF 6, 6-1 to 6-5), which were then issued (ECF 7, 8). On October 31, 2022, summons were returned executed as to 24 Capital Funding, LLC, Allayev, and Defendant Sankov. (ECF 9).

Thereafter, Plaintiff moved for an entry of default against Defendants on November 29, 2022 (ECF 10), which was granted the next day (ECF 11). Plaintiff then moved for a default judgment against Defendants on November 30, 2022 (ECF 12), which prompted the Court to direct Plaintiff to clarify whether it would withdraw the request for class certification initially filed with the complaint (ECF 13). Plaintiff subsequently withdrew the request for class certification. (ECF 14-15).

During a telephonic status conference on January 23, 2023, before the District Judge, however, Plaintiff informed the Court it would file an amended complaint. (ECF 18). The next day, Plaintiff filed the amended complaint (ECF 19), and as such, the Court rendered the motion for default judgment filed on November 30, 2022, moot (ECF 20). In the amended complaint, Plaintiff removed the class action claim and the violation of Ohio Revised Code § 1703.003, leaving the other claims intact. (ECF 19).

---

[1] Allayev (misspelled as Allayer in Plaintiff's first proposed summons) is apparently a member of 24 Capital, as he signed 24 Capital's biennial statement filed with the State of New York in August 2020 in his capacity as "member." (ECF 35-2 at 2).

Plaintiff then filed a second motion for default judgment (ECF 21), which the Court denied because Plaintiff failed to file a motion for entry of default before its motion for default judgment (ECF 22). Plaintiff corrected this procedural error by filing a motion for entry of default on February 23, 2023 (ECF 23, 24), which was granted on February 27, 2023 (ECF 26). Plaintiff then filed a third motion for default judgment (ECF 27), the one that is now before the Court.

As noted in the September 18, 2023, Order issued by the undersigned (ECF 34), after filing its motion for default judgment, Plaintiff filed several notices regarding the status of service of process during the period of January 2023 to September 2023—unprompted. (ECF 31 to 33; *see* ECF 17). In those notices, Plaintiff states that Defendants have failed to move or otherwise plead following proper service and it attached several documents purporting to show the same. (ECF 17, 31 to 32). Because Plaintiff had not explained how those documents support proper service, the undersigned ordered Plaintiff to file a brief of fifteen pages or less, citing legal authority supporting that Plaintiff had met the service of process requirement and explaining how the documents it submitted to the Court support service of process. (ECF 34).

On September 28, 2023, Plaintiff filed a response to the undersigned's Order, explaining that Federal Rule of Civil Procedure 4(e)(1) permits service of process under New York law and that, pursuant to New York law, service may be made under article three of New York's limited liability company ("LLC") law, which "authorizes service on an LLC via the secretary of state." (ECF 35 at 3). Alternatively, Plaintiff may deliver a copy of process personally to (i) any member of the LLC located in New York, if the management of the LLC is vested in its members, (ii) any manager of the LLC located in New York, if the management of the LLC is vested in one or more managers, (iii) to any other agent authorized by appointment to receive

process, or (iv) to any other person designated by the LLC to receive process, in the manner

provided by law for service of a summons as if such person was a defendant. (ECF 35 at 2-3

(citing N.Y. C.P.L.R. §311-a (McKinney 2019))).

Plaintiff also argues that service is proper with respect to Defendant Sankov because he

was served with the initial complaint and summons and that under Rule 5, he did not need to be

served the amended complaint. (ECF 35 at 3-4). Plaintiff also cites case law for the proposition

that a process server's affidavit of service creates a presumption of proper service and that a

process server may reasonably rely on a corporation's employees to identify the individuals

authorized to accept service. (*Id.* at 3 (citing *Old Republic Ins. Co. v. Pac. Fin. Servs. of. Am.,*

*Inc.*, 301 F.3d 54, 57 (2d Cir. 2002))). Plaintiff then explains that it has comported with New

York law in serving process and details its effort to do so. Thus, before addressing the merits of

Plaintiff's motion for default judgment, the Court must be satisfied that service of process was

accomplished. *Swaim v. Moltan Co.*, 73 F.3d 711, 719 (7th Cir. 1996); *Roor Int'l BV v. Mut.*

*Traders, LLC*, No. 19-CV-5064, 2023 WL 2789325, at *5 (N.D. Ill. Apr. 5, 2023).

*B. Legal Standard*

"Valid service of process is a prerequisite to a district court's assertion of personal

jurisdiction." *Swaim*, 73 F.3d at 719 (citing *Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.,*

484 U.S. 97, 104 (1987)); *United States v. Ligas,* 549 F.3d 497, 500 (7th Cir. 2008) ("A district

court may not exercise personal jurisdiction over a defendant unless the defendant has been

properly served with process . . . ." (citation omitted)). As such, in assessing Plaintiff's motion

for default judgment, the Court must be satisfied that service of process is proper or that it is

substantially accomplished. *Swaim*, 73 F.3d at 719; *see also Trade Well Int'l v. United Cent.*

*Bank*, 825 F.3d 854, 859 (7th Cir. 2016) ("[A] judgment is void if it was rendered in a manner

inconsistent with due process of law." (citation and internal quotation marks omitted)); *United States v. Summit, Inc.*, No. 2:19-CV-250-HAB-JPK, 2022 WL 2195443, at *6 (N.D. Ind. Jan. 6, 2022). "Valid service of process comprises more than actual notice; it requires a legal basis for holding the defendant susceptible to service of the summons and complaint." *Swaim*, 73 F.3d at 719 (citation omitted).

*C. Analysis*

The Court must be satisfied that Defendants Sankov and 24 Capital are properly served. "Federal Rule of Civil Procedure 4 controls service of process in federal court." *Garner v. Bumble Inc.*, No. 3:21-CV-50457, 2023 WL 6065481, at *2 (N.D. Ill. Sept. 18, 2023). Rule 4(h) provides the framework for serving corporations, partnerships, or associations:

> Unless federal law provides otherwise . . . , a domestic or foreign corporation, or a partnership or other unincorporated association that is subject to suit under a common name, must be served:
> (1) in a judicial district of the United States:
> (A) in the manner prescribed by Rule 4(e)(1) for serving an individual; or
> (B) by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process and—if the agent is one authorized by statute and the statute so requires—by also mailing a copy of each to the defendant . . . .

Fed. R. Civ. P. 4(h).

Rule 4(e)(1) further permits service of process on an individual by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made." Fed. R. Civ. P. 4(e)(1).

Once service of the complaint and summons has been accomplished, Rule 5(a)(2) exempts a party from serving an amended pleading "on a party who is in default for failing to appear" unless the amended pleading "asserts a new claim for relief against such a party," in

which case the pleading "must be served on that party under Rule 4." Fed. R. Civ. P. 5(a)(2); *Roor Int'l BV*, 2023 WL 2789325, at *5.

Plaintiff first argues that Sankov was properly served with the initial complaint, and that because the amended complaint did not assert any new claims, Sankov can be deemed to be served with the amended complaint. (ECF 35 at 3-4). Here, as stated by Plaintiff, New York law prescribes the manner in which service may be effected under Rule 4(e), given that it is the state in which service was made. *See* Fed. R. Civ. P. 4(e)(1); Fed. R. Civ. P. 4(h)(1)(A). The docket indicates that Plaintiff served the summons and complaint on October 28, 2022, upon Lisa Sohum, an authorized agent for 24 Capital Funding, LLC, Allayev, and Sankov, and that Sankov was served the initial complaint and summons, as evidenced by the summons returned executed. (ECF 9, 9-1 to 9-2); *see Old Republic Ins. Co.*, 301 F.3d at 57 ("In New York, a process server's affidavit of service establishes a prima facie case of the account of the method of service, and thus, in the absence of contrary facts, we presume that [a party] was properly served with the complaint." (citing *Nyctl 1997-1 Tr. v. Nillas,* 732 N.Y.S.2d 872, 873 (N.Y. App. Div. 2001)). Yet, Sankov failed to file an appearance and a default was entered against him—twice. (ECF 11, 26). Plaintiff was not obligated to serve Sankov the amended complaint, as the amended complaint did not assert new claims or parties. *See* Fed. R. Civ. P. 5(a)(2); (ECF 19). Therefore, service of process appears to be sufficient as to Sankov.

Plaintiff also argues that service of process is proper with respect to Defendant 24 Capital for substantially the same reasons. (ECF 35 at 3-4). It intimates that it attempted to serve 24 Capital at its most recent service of process address listed on its biennial statement—which, under New York law, corresponds to the updated service of process address in the LLC's articles of organization—but that service could not be accomplished there. (*Id.* at 2). Plaintiff

also contends that it served 24 Capital's "managing member," Allayev, and therefore, that it successfully served 24 Capital. (*Id.* at 2-3).

The summons returned executed for an entity named 24 Capital Funding LLC, after which the clerk entered a default against Defendant 24 Capital. (ECF 11, 26). Plaintiff further attempted service at 24 Capital's address, the same which appears on 24 Capital's most recent biennial statement, in accordance with New York law. (ECF 35-2 at 2 (biennial statement listing 24 Capital's service of process address as: 24 Capital LLC, 31-10 37th Ave, Suite 202, Long Island City, NY 11101); ECF 35-3 at 1 (affidavit of non-service stating service was attempted upon 24 Capital at 31-10 37th Ave, Suite 202, Long Island, NY 11101 but could not be accomplished "because all reasonable inquir[i]es suggest the defendant moved to an undetermined address")).[2] With no success in serving 24 Capital at its service of process address, Plaintiff attempted and succeeded in serving Allayev, whom Plaintiff purports serves as a managing member for 24 Capital.

Plaintiff's efforts to serve Defendant 24 Capital are not sufficient to assure the Court that it has jurisdiction over that party. To start, although the summons issued to 24 Capital Funding, LLC, were returned executed by that party, the Court has no guarantee that 24 Capital Funding, LLC, and 24 Capital are the same entity. Further, there is no evidence in the record that Allayev is 24 Capital's managing member as Plaintiff represents. Rather, Plaintiff submitted documents showing that Allayev is a "member" and "organizer" of 24 Capital, titles which are distinct from

---

[2] Parties must regularly update the address listed on an LLC's article of organization every two years in a biennial statement. N.Y. Limit. Liab. Co. § 301 (McKinney) ("[E]very limited liability company to which this chapter applies, shall biennially in the calendar month during which its articles of organization or application for authority were filed, . . . file on forms prescribed by the secretary of state, a statement setting forth the post office address within or without this state to which the secretary of state shall mail a copy of any process accepted against it served upon him or her. Such address shall supersede any previous address on file with the department of state for this purpose.").

"managing member." (ECF 35 at 3; *see* ECF 9-1 (affidavit of service); ECF 35-1 at 2 (listing Allayev as organizer); ECF 35-2 at 2 (listing Allayev as member)). And Plaintiff does not explain how under New York law those titles would be commensurate to being a "managing member." Essentially, Plaintiff has not carried its burden to show that the Court has jurisdiction over Defendant 24 Capital through effective service. *Cardenas v. City of Chi.*, 646 F.3d 1001, 1005 (7th Cir. 2011) ("The plaintiff bears the burden to demonstrate that the district court has jurisdiction over each defendant through effective service." (citation omitted)).

In sum, because the amended complaint does not add new claims or parties, and because the original claim was properly served upon Sankov, service appears appropriate on that Defendant. However, Plaintiff fails to show that Defendant 24 Capital was properly served. Therefore, I FIND that service was properly accomplished upon Defendant Sankov such that the Court has jurisdiction to rule on the motion for default judgment with respect to claims against him, but that the Court does not have jurisdiction over Defendant 24 Capital because he was not properly served. Nevertheless, for purposes of completeness, the undersigned will evaluate the substantive claims against both parties as if Plaintiff had properly served Defendant 24 Capital.

## II. DEFAULT JUDGMENT

### A. Factual Background

Turning to the merits of Plaintiff's claims, the amended complaint alleges, in relevant part, the following:[3]

On February 21, 2019, Plaintiff and 24 Capital entered into a merchant cash advance agreement ("contract" or "MCA"), under which Plaintiff would accept and borrow funds from 24 Capital and repay those funds against its future revenue streams ("receivables"). (ECF 19 ¶¶ 1,

---

[3] The amended complaint is now the operative complaint and will be referred herein as "complaint."

10).[4] However, 24 Capital would extract daily payments from Plaintiff's account through use of daily automatic clearing house ("ACH") debits regardless of whether Plaintiff had receivables in its account. (*Id.*). The daily debits would deplete Plaintiff's cash flow, such that it became reliant on obtaining additional funding promised by 24 Capital. (*Id.* ¶ 10). Yet rather than provide the alleged promised funds, 24 Capital turned to collection laws, obtaining a confessed judgment against Plaintiff before the Supreme Court of New York on May 13, 2019, for failing to pay under the MCA. (*Id.* ¶¶ 1, 10; ECF 19-1 at 25-26, 28-30).[5] In doing so, Defendants would rely on Sankov's affidavit, in which he would represent himself as an Operations Manager for 24 Capital. (ECF 19 ¶¶ 10, 13; ECF 19-5 at 3-4). In turn, after obtaining the confessed judgment, Defendants would contact Plaintiff's banks in an attempt to restrain Plaintiff's accounts. (ECF 19 ¶¶ 1, 14; *see* ECF 19-2).

These events, Plaintiff alleges, were not isolated but rather part of a scheme in which 24 Capital would regularly enter into so-called MCAs with "unsuspecting merchants" before draining their funds, making illusory promises to lend additional funds, and ultimately obtaining confessed judgments in court, all while distributing the funds obtained illegally to each Defendant. (ECF 19 ¶¶ 15-16, 26-27). In that regard, Plaintiff points to two other parties who signed similar MCAs and confessed judgment under similar circumstances as Plaintiff. (ECF 19-3; 19-4).

Now, Plaintiff alleges that Defendants misrepresented "the operation of the MCA program and the manner in which the [contract] would work." (ECF 19 ¶ 10). Plaintiff explains

---

[4] Plaintiff alleges in the complaint that "[t]he transactions complained of . . . took place, in part, from at least November 5, 2018, to the present" (*id.* ¶ 8), but it is unclear what other conduct relevant to Plaintiff's claims took place before February 21, 2019, the date the MCA was signed.

[5] It also appears that Defendants submitted a proposed confessed judgment on May 10, 2019 (ECF 19-1 at 18).

that it would be manipulated "into a position of financial helplessness which would, and did, induce and coerce [it] to accept Defendants' promise to make additional advances." (*Id.* ¶ 11). Plaintiff also accuses Defendants of "perpetrat[ing] the scheme to induce PBE to borrow funds against receivables, . . . to circumvent New York usury and debt collection laws, and to escape liability and detection" by submitting fraudulent affidavits to New York and Ohio courts, submitting fraudulent documents to Plaintiff's banks, and collecting unlawful debts. (*Id.* ¶¶ 12-13). Lastly, Plaintiff alleges that Defendants' false representations to Plaintiff's banks resulted in "employ[ing] collection techniques that violated federal law, including the provisions of the Due Process Clause, by misrepresenting the extent of contacts [Plaintiff] had with the State of New York." (*Id.* ¶ 1).

## *B. Legal Standard*

"Default is a 'two-step process' that is 'clearly outlined' in Rule 55(a) and 55(b) of the Federal Rules of Civil Procedure." *Mortland v. Lights Out Devs., LLC*, No. 1:19-cv-2557-JMS-DLP, 2020 WL 3577867, at *1 (S.D. Ind. July 1, 2020) (citing *VLM Food Trading Int'l, Inc. v. Ill. Trading Co.*, 811 F.3d 247, 255 (7th Cir. 2016)). "The first step is the entry of default, the consequence of which is that the well-pleaded allegations in the complaint concerning liability are taken as true." *Id.* (citation omitted). After the entry of default, the plaintiff may move for the entry of a default judgment, "which requires [the plaintiff] to establish [its] entitlement to the relief [it] seeks." *Id.* (citation and internal quotation marks omitted). "[T]he entry of default judgment is only appropriate if [the allegations in the complaint], along with other evidence submitted, establish a cognizable claim for relief." *Id.* (collecting cases).

As stated earlier, a clerk's entry of default was entered on November 30, 2023, against Defendants after Plaintiff filed its complaint (ECF 11), and again on February 27, 2023, after

Plaintiff filed its amended complaint (ECF 26). Thus, Plaintiff has satisfied the first step of the two-step process, with the caveat that service of process upon Defendant 24 Capital was likely not accomplished.

With respect to step two, the Court must confirm that the allegations in the complaint establish a cognizable claim for relief. *See Mortland*, 2020 WL 3577867, at *1; *Holland v. Cerberus Cap. Mgmt.*, No. 2:13-CV-00491, 2014 WL 6473479, at *11 (N.D. Ind. Nov. 18, 2014), *aff'd*, No. 14-3752 (7th Cir. Mar. 9, 2015), *aff'd*, No. 15-1040 (7th Cir. Apr. 20, 2015) ("[D]efault judgment is only appropriate if the well-pleaded allegations . . . are sufficient to establish a legal claim." (collecting cases)). In other words, "[p]laintiffs seeking default judgment must demonstrate they are entitled to judgment as a matter of law." *Holland*, 2014 WL 6473479, at *11 (citing *Cass Cnty. Music Co. v. Muedini,* 55 F.3d 263, 265 (7th Cir. 1995)).

### C. Breach of Contract

To begin, Plaintiff advances a breach of contract claim in Count VI, alleging that Defendants breached the contract beginning on the date of its execution, February 21, 2019, when they collected payments under the MCA without regard to Plaintiff's receivables.[6] Because the contract at issue states that it "shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable [principles] of conflicts of law" (ECF 19-1 at 7), Plaintiff's breach of contract claim is governed by New York state law.[7]

---

[6] Because many of Plaintiff's RICO allegations are premised on the outcome of the breach of contract claim, the undersigned finds it proper to analyze this claim first. (*See* ECF 19 ¶ 51 (stating "Defendants breached the alleged MCA agreement with PBE by participating in the unlawful scheme" alleged in the complaint)).

[7] As to Plaintiff's other tort claims, "the Seventh Circuit has noted, in reliance on circuit court opinions interpreting the laws of various states, that district courts . . . should not apply contractual choice of law clauses to tort claims unless it is clear that the parties intended its application to tort claims." *Cunningham Charter Corp. v. Learjet, Inc.*, 870 F. Supp. 2d 571, 575 (S.D. Ill. 2012) (collecting cases). Additionally, "[w]hen no party raises the choice of law issue, the federal court may simply apply the forum state's substantive law." *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014) (citation omitted). Therefore, because the choice-of-law clause does not explicitly

Under New York law, a breach of contract claim requires the plaintiff to allege "(1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages." *34-06 73, LLC v. Seneca Ins. Co.*, 198 N.E.3d 1282, 1287 (2022) (citations omitted); *see NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 304 (7th Cir. 2018) (stating a breach of contract claim under New York law requires a plaintiff to show "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages" (citing *Terwilliger v. Terwilliger*, 206 F.3d 240, 246 (2d Cir. 2000)).

Based on the review of the record, it appears a contract exists, which Plaintiff propounds as an exhibit to its complaint and motion for default judgment (ECF 19-1 at 1-17; ECF 27-1 at 1-17).[8] Therefore, the first requirement for a successful breach of contract claim is satisfied. Further, Plaintiff alleges that it has suffered damages in the form of confessions of judgment, restrained accounts, and an inability to operate its business as a result of the alleged breach, thus satisfying the fourth element of the breach of contract claim.

As for the third element of a breach of contract claim, the complaint points to two separate breaches of the contract: first, that 24 Capital promised it would only extract payments under the MCA in proportion to incoming receivables, while instead taking daily debits without

---

apply to tort claims stemming from the contract, and because Plaintiff has not raised a choice-of-law issue, Indiana law applies to the other state claims in Plaintiff's complaint.

[8] The undersigned assumes that the absence of 24 Capital's signature on the MCA submitted to the record does not render the contract invalid, as Plaintiff does not challenge the contract on this ground. In any event, "a contract may be valid even if it is not signed by the party to be charged, provided its subject matter does not implicate a statute—such as the statute of frauds—that imposes such a requirement." *Flores v. Lower E. Side Serv. Ctr., Inc.*, 828 N.E.2d 593, 596 (N.Y. 2005) (citation omitted). Under New York law, it appears the contract would not be void for lack of a signature under the statute of frauds. N.Y. Gen. Oblig. Law § 5-701 (McKinney). Additionally, it would seem unlikely that Defendants would write the terms of the contract, tender the contract for Plaintiff's signature, and seek judgment under the contract for breach, if it had never intended to be bound by it. *See Flores*, 828 N.E.2d at 597 ("[A]n unsigned contract may be enforceable, provided there is objective evidence establishing that the parties intended to be bound." (citations omitted)).

regard to receivables (ECF 19 ¶ 10); and second, that 24 Capital promised Plaintiff additional funding once these daily debits rendered Plaintiff "in financial helplessness," but that 24 Capital never provided those funds, instead obtaining the confessed judgments in court. (*Id.* ¶¶ 10-11).

In relevant part, the MCA signed on February 21, 2019, between 24 Capital and Plaintiff, who is referred to as "Merchant" in the MCA, provides that Plaintiff:

> sells, assigns, and transfers to 24 Capital . . . in consideration of [$184,796.06], all of Merchant's future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (the "Receipts" defined as all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the Merchant's business), for the payments due to Merchant as a result of Merchant's sale of goods or services (the "Transactions") until [$264,258.37] has been delivered by or on behalf of Merchant to 24 Capital.

(ECF 19-1 at 1).[9] The contract further provides that Plaintiff "shall remit [25%] of the Merchant's settlement amounts due from each Transaction, until such time as 24 Capital, receives payment in full of [$264,258.37]," and that Plaintiff "authorizes 24 Capital, to ACH Debit the specified remittances from the Merchant's Account on a daily basis." (*Id.*). Redundantly, the contract states that Plaintiff "authorizes [Capital] to ACH Debit the specified remittances from the Merchant's Account on a daily basis" and that "24 Capital[] will debit the specific daily amount each business day." (*Id.*).

The contract also contains a reconciliation provision, which provides that Plaintiff "shall deliver to 24 CAPITAL, no later than the 18th date of each month the bank statement for the Account in respect of the immediately preceding month," and that 24 Capital "shall reconcile the [Plaintiff's] Account by either crediting or debiting the difference from or back to [Plaintiff's] Account so that the amount debited per month equals [25%]." (*Id.*).

---

[9] The undersigned understands "Receipts" to refer to receivables.

The contract, however, states that "[p]ayments made to 24 CAPITAL, in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers in the manner provided in Section 1.1." (*Id.* at 3). Nevertheless, under the contract, Plaintiff is "responsible for ensuring that the specified percentage to be debited by 24 CAPITAL, [meaning, 25%,] remains in the Account and will be held responsible for any fees incurred by 24 CAPITAL, resulting from a rejected ACH attempt or an event of default." (*Id.* at 1).

In another document titled "Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits)," Plaintiff authorized 24 Capital to debit $2,568.95, or 25% of Plaintiff's receivables, on Mondays through Fridays. (*Id.* at 15). In that document, Plaintiff also agreed that 24 Capital "needs viewing access to [Plaintiff's] bank account each business day in order to calculate the amount of [the] daily payment." (*Id.* at 16).

Plaintiff also signed a Weekly Advance Addendum to the Merchant Agreement ("Addendum"), in which 24 Capital and Plaintiff agreed, among other things, that:

> 24 CAPITAL, reserves the right to terminate its obligation to make the weekly purchases at its option at any time after: . . . (iv) the Specific Daily Amount is not available for ACH by 24 CAPITAL, on five business days in any 20 business day period; (v) [Plaintiff] has a 20% decline in monthly deposits that is not due to regular seasonal payment fluctuations; or (vi) 24 CAPITAL, believes in its sole judgment that [Plaintiff]'s business may not be able to generate future Receipts sufficient to deliver the Purchased Receipts in a timely manner.

(*Id.* at 13).

In light of the contract's plain language, the undersigned is unconvinced that Plaintiff's complaint meets the third element of a breach of contract claim. Under New York law, "[t]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent and the best evidence of what parties to a written agreement intend is

14

what they say in their writing." *Donohue v. Cuomo*, 184 N.E.3d 860, 866 (N.Y. 2022) (citation, brackets, and internal quotation marks omitted). "Where a contract was negotiated between sophisticated, counseled business people negotiating at arm's length," as is the case here, "courts should be especially reluctant to interpret an agreement as impliedly stating something which the parties specifically did not include." *Id.* (citation, brackets, and internal quotation mark omitted); (*see* ECF 19-1 at 8 (stating the parties "have reviewed [the contract] with attorney[s] of their own choosing and have relied only on their own attorneys' guidance and advice")).

Here, the complaint alleges that the parties agreed that Defendants would debit the daily amounts out of Plaintiff's accounts *only if* it had receivables. (ECF 19 ¶ 1 ("Defendants promised . . . to only recover payment from receivables . . . .")). The contract does include language which could lend support to this interpretation, namely the provision that "[p]ayments made to 24 CAPITAL, in respect to the full amount of the Receipts *shall be conditioned upon Merchant's sale of products and services*, and the payment therefore by Merchant's customers in the manner provided in Section 1." (ECF 19-1 at 3 (emphasis added)). Under Plaintiff's reading of the contract, this provision would, in effect, mean that payments made to 24 Capital, in respect to the full amount of the Receipts shall be conditioned upon *the existence of* Merchant's sale of products and services. But a holistic reading of the contract does not support this conclusion. *Kaplan v. Kaplan*, 106 N.Y.S.3d 102, 105 (N.Y. App. Div. 2019) ("A contract should be read as a whole, with every part interpreted with reference to the whole; if possible, the contract will be interpreted so as to give effect to its general purpose." (collecting cases)).

To begin, the contract expressly provides for daily debits out of Plaintiff's receivables. This requirement does not lack for repetition given that, in a manner of pages, the contract recurrently mentions that payments are due on a daily basis. Further, the contract permits

payments amounting to twenty-five percent of Plaintiff's receivables, which reinforces the conclusion that the payment amounts were conditioned on the amount of receivables, not whether there were receivables at all. Bolstering this conclusion is the provision contemplating that 24 Capital "needs viewing access to [Plaintiff's] bank account each business day in order to calculate the amount of [the] daily payment." (*Id.* at 16).

Lastly, while daily debits are repeatedly provided for in the contract, Plaintiff was simultaneously "responsible for ensuring that the specified percentage to be debited by 24 Capital, remains in the Account and [would] be held responsible for any fees incurred by 24 Capital, resulting from a rejected ACH attempt or an event of default." (*Id.* at 1). Construing the contract to imply a condition that Plaintiff have receivables before any payment would render useless the provision requiring Plaintiff to maintain receivables in order for 24 Capital to extract payments. *See God's Battalion of Prayer Pentecostal Church, Inc. v. Miele Assocs., LLP*, 845 N.E.2d 1265, 1267 (N.Y. 2006) ("A contract should be read to give effect to all its provisions." (citations and internal quotation mark omitted)); *Mahmood v. Cnty. of Suffolk*, 88 N.Y.S.3d 577, 579 (N.Y. App. Div. 2018) ("[A] court should not read a contract so as to render any term, phrase, or provision meaningless or superfluous." (citations omitted)).

Going even further, Plaintiff's reading of the contract would mean that Plaintiff could choose not to generate any revenue and, in turn, be free from repaying 24 Capital. This reading conflicts with the spirit of the Addendum's provision permitting 24 Capital to terminate its obligation under the contract if:

> the Specific Daily Amount is not available for ACH by 24 CAPITAL, on five business days in any 20 business day period; (v) [Plaintiff] has a 20% decline in monthly deposits that is not due to regular seasonal payment fluctuations; or (vi) 24 CAPITAL, believes in its sole judgment that [Plaintiff]'s business may not be able to generate future Receipts sufficient to deliver the Purchased Receipts in a timely manner.

(*See* ECF 19-1 at 13).

Thus, as the undersigned sees it, Plaintiff's claim of breach of contract is misplaced: while the payments to 24 Capital were conditioned on Plaintiff's receivables, in the broad sense, the payments depended on the *amount* of receivables, not whether there were *any* receivables in Plaintiff's account.[10] As such, despite the complaint's allegations, the exhibits to the complaint show that Plaintiff has no legal claim for breach of contract. *See Atkins v. City of Chi.*, 631 F.3d 823, 832 (7th Cir. 2011) ("[A plaintiff] can plead himself out of court by pleading facts that show that he has no legal claim." (collecting cases)).

As for the second basis for a breach of contract—Defendants' alleged promise of additional funding—the undersigned cannot discern the circumstances of this alleged agreement in the complaint. To the extent the parties agreed separately from the contract that Defendants would change the "total purchase price" of $184,796.06 (ECF 19-1 at 1), the complaint does not point to or allege the existence of any extrinsic evidence that suggests this promise somehow crystallized into the contract now before the Court or into a new contract of its own.[11] That the contract only permits modification of its terms if they are "in writing and signed by 24 CAPITAL" (*id.* at 7), all the more defeats any claims of breach of contract premised on a promise of additional funding given that Plaintiff has not made allegations that such writing

---

[10] In effect, the fact that Plaintiff confessed judgment confirms this reading of the contract. (*See id.* at 28-30).

[11] Even if there was extrinsic evidence supporting such, the parol evidence rule would prevent the Court from incorporating new terms not appearing within the four corners of the contract. Indeed, the agreement contains an integration clause (also known as a merger clause) explicitly stating that the parties "acknowledge and agree that [they are] not relying on any representations not specifically embodied in this Agreement." (ECF 19-1 at 8); *see Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 434 (N.Y. 2013) ("To allow parol evidence at this late stage to inject an entirely different obligation into the parties' . . . contract would not only modify the requirements spelled out in that agreement, it would also negate the merger clause, which states that the [contract] is a fully integrated document superseding all other understandings, whether written or oral."); *Jarecki v. Shung Moo Louie*, 745 N.E.2d 1006, 1009 (N.Y. 2001) ("The purpose of a merger clause is to require the full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to alter, vary or contradict the terms of the writing. The merger clause accomplishes this purpose by evincing the parties' intent that the agreement is to be considered a completely integrated writing." (citations and internal quotation marks omitted)).

exists or presented the writing to the Court. This allegation is therefore insufficient to support Plaintiff's claim that Defendants breached the contract.

Even crediting Plaintiff's claim that Defendants breached the terms of the contract by debiting payments from Plaintiff's account although it lacked receivables, Plaintiff cannot successfully allege that it meets the second prong of a breach of contract claim, that is, that it performed in accordance with the contract. Indeed, it was Plaintiff's *obligation* to maintain those receivables, and the complaint makes clear that, at some point after Plaintiff signed the contract, it failed to maintain the receivables in its account. (*See* ECF 19 ¶ 1 ("Defendants promised . . . to only recover payment from receivables but in reality, . . . they extracted daily payments from PBE regardless of whether receivables had come into the bank account of PBE or not."); ¶ 11 (stating it was in "a position of financial helplessness")). Plaintiff's failure to maintain receivables, in turn, was a breach of the express provision assigning responsibility on Plaintiff of "ensuring that the specified percentage to be debited by 24 Capital [meaning, 25%], remains in the Account," such that Plaintiff "will be held responsible for any fees incurred by 24 Capital, resulting from a rejected ACH attempt or an event of default." (ECF 19-1 at 1).

A last note worth mentioning, Plaintiff sporadically states that Defendants extended MCAs to circumvent usury law. (ECF 19 ¶¶ 1, 12, 19, 26). To the extent Plaintiff claims, in the alternative of its breach of contract claim, that the contract was void under usury law and that Defendants could not have obtained confessions of judgment, this argument would be unconvincing. Plaintiff has waived any defense to the enforcement of the contract under usury law, a waiver which New York courts generally uphold. *In re Merhi*, 518 B.R. 705, 714 (Bankr. E.D.N.Y. 2014) ("New York courts have consistently held that a borrower can waive claims of usury absent express language identifying the claims to be waived." (collecting cases)); *In re*

*Higgins*, 270 B.R. 147, 156 (Bankr. S.D.N.Y. 2001) ("[I]n New York State courts[,] it has been established that usury is a personal defense which may be waived by the borrower." (citation, brackets, and internal quotation marks omitted)); *Reyes v. Carver Fed. Sav. & Loan Ass'n,* 344 N.Y.S.2d 501 (N.Y. Sup. Ct. 1973); *see also Pro. Merch. Advance Cap., LLC v. C Care Servs., LLC*, No. 13-cv-6562 (RJS), 2015 WL 4392081, at *5 (S.D.N.Y. July 15, 2015). Here, the contract provides that Plaintiff "knowingly and willingly waives the defense of [u]sury in any action or proceeding." (ECF 19-1 at 3). Additionally, Plaintiff's conduct—in confessing judgment—further suggests that it has abandoned any defense under usury law. (*See id.* at 28-30).[12]

Still, even if the contract was camouflaged as an MCA to circumvent usury law when in reality it should have been subject to New York usury law, the complaint does not lay the basis for a violation of New York usury law, as the allegation that Defendants circumvented usury law are "nothing more than conclusions" that cannot support a legal claim. *See Holland*, 2014 WL 6473479, at *11 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Therefore, I FIND that Plaintiff's breach of contract claim must fail because the complaint's allegations do not support the conclusion that Plaintiff performed in accordance with the contract nor that Defendant breached the contract.

### D. Section 1962(c) RICO claim

Turning to Plaintiff's federal RICO claim, Plaintiff alleges that 24 Capital, Sankov, and Allayev "were members and associates of a national and global predatory loan collectors enterprise . . . , a criminal organization whose members and associates engaged in crimes,

---

[12] Even assuming that Plaintiff has not waived a defense of usury law, Plaintiff would—in essence—be requesting this Court to invalidate a contract under which a state court issued a judgment, which in turn would implicate questions of jurisdiction. This issue is largely left unaddressed in the complaint and Plaintiff's motion for default judgment.

including without limitation the collection of unlawful debts" in violation of the RICO Act, Section 1962(c). (ECF 19 ¶ 25).

"The RICO statute makes it 'unlawful for any person employed by or associated with any enterprise . . . [with an interstate or foreign commerce nexus] to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.'" *Ryder v. Hyles*, 27 F.4th 1253, 1256-57 (7th Cir. 2022) (alterations in original) (quoting 18 U.S.C. § 1962(c)). To successfully plead a RICO claim, a plaintiff must plead "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 336 (7th Cir. 2019) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496-97 (1985)); *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 727 (7th Cir. 1998). "Pleading requirements are to be strictly enforced when default judgment is sought under RICO." *Holland*, 2014 WL 6473479, at *12 (citation omitted); *Rosenbaum v. Seybold*, No. 1:06-CV-352-TLS, 2013 WL 2285946, at *9 (N.D. Ind. May 23, 2013).

Plaintiff's failure to make a breach-of-contract claim foreshadows many of the challenges regarding its RICO claim. Indeed, because the complaint and supporting documents suggest that, in seeking to obtain the confession judgments and restraining Plaintiff's assets, Defendants were acting pursuant to the MCA, it could hardly be said that they engaged in conduct submitting them to RICO liability. Precisely, Plaintiff's complaint does not allege the kind of criminal conduct required to state a RICO claim as it does not allege predicate criminal acts committed by Defendants and much less a pattern of racketeering activity.

1. Racketeering Activity

A plaintiff alleging a RICO claim must show that there was racketeering activity. "Not every alleged bad act constitutes racketeering activity under RICO—the federal RICO statute

enumerates an exclusive list of specific offenses that qualify as predicate acts of 'racketeering activity' for purposes of RICO liability." *Holland*, 2014 WL 6473479, at *6 (citing 18 U.S.C. § 1961(1); *McDonald v. Schencker,* 18 F.3d 491, 495 (7th Cir. 1994)); *Starfish Inv. Corp. v. Hansen*, 370 F. Supp. 2d 759, 772 (N.D. Ill. 2005) ("Not all crimes or misdeeds constitute racketeering activities; instead, only those offenses set forth in 18 U.S.C. § 1961 qualify as predicate acts for purposes of the RICO statute." (footnote and citation omitted)). Mail fraud and wire fraud, as alleged here, are among those enumerated offenses qualifying as racketeering activity. 18 U.S.C. § 1961(1). In alleging mail and wire fraud, a plaintiff must plead "(1) the defendant's participation in a scheme to defraud; (2) [the] defendant's commission of the act with intent to defraud; and (3) the use of wires—or mail—in furtherance of the fraudulent scheme." *Sabrina Roppo v. Travelers Com. Ins. Co.*, 869 F.3d 568, 589 (7th Cir. 2017) (internal quotation marks omitted) (citing *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 657 (7th Cir. 2015)); *Amari Co. v. Burgess*, 836 F. Supp. 2d 648, 650 (N.D. Ill. 2011).

When a plaintiff alleges mail and wire fraud as a predicate act of racketeering activity, however, the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) apply and require a plaintiff to allege fraud with particularity. *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001); *Menzies*, 943 F.3d at 338; *Holland*, 2014 WL 6473479, at *6. Under Rule 9(b), a plaintiff must provide "precision and some measure of substantiation" to each fraud allegation, meaning a plaintiff must plead the "who, what, when, where, and how" of the alleged fraud. *Menzies*, 943 F.3d at 338 (citation omitted). In other words, in order to satisfy this standard, a plaintiff must allege "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation" perpetrating the fraud was communicated to the plaintiff. *Vicom, Inc. v.*

*Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994) (citations and quotation marks omitted). When multiple defendants are involved, "the complaint should inform each defendant of the nature of his alleged participation of the fraud." *Id.* at 778 (citations omitted); *see also Sears v. Likens,* 912 F.2d 889, 893 (7th Cir. 1990) (stating the complaint did not satisfy Rule 9(b) because it "lump[ed] all the defendants together and [did] not specify who was involved in what activity").

Here, Plaintiff's complaint alleges the following predicate acts of mail and wire fraud:

    a.   Defendants placed telephone calls to PBE to fraudulently induce it to remit funds.

    b.   Defendants used 24 Capital to attempt to manipulate PBE into a predatory loan.

    c.   Defendants used 24 Capital as a conduit to divert funds to 24 Capital, Sankov and Mark All[a]yev.

    d.   Defendants transmitted via PACER CEO Mark Allayev's sworn denial that Sankov worked for 24 Capital in an attempt to perpetrate a fraud upon a federal Court, the Southern District of Ohio.

    e.   Defendants submitted via PACER Allayev's materially false declaration about the relationship between Sankov and 24 Capital to attempt to cover up Defendants' crimes, lies and wrongdoing.

    f.   In reliance on the materially false and misleading affidavits electronically transmitted by Jason Sankov to Indiana, Defendants obtained defaults or filed garnishments against PBE's bank, credit union and PayPal account in Indiana.

    g.   In reliance on the materially false and misleading affidavits electronically transmitted by Jason Sankov to Indiana, Defendants obtained judgments against PBE and caused significant damages to PBE.

(ECF 19 ¶¶ 31-32).

The predicate acts all have deficiencies such that they cannot support an allegation of racketeering activity. As an initial matter, many of the alleged predicate acts are not specific enough to meet the heightened requirement under Rule 9(b). The first three predicate acts do not allege "when" the alleged acts occurred, "who" individually committed those acts, or "how" they

accomplished those acts.[13] Predicate (a) does not inform "what" was the content of the communication or "why" it was fraudulent. *See Jepson, Inc. v. Makita Corp.,* 34 F.3d 1321, 1328 (7th Cir.1994) ("[L]oose references to mailings and telephone calls in furtherance of a purported scheme to defraud will not do." (citation and internal quotation marks omitted)); *Holland*, 2014 WL 6473479, at \*7 ("Plaintiff alleges he spoke to some individuals on the phone, like Defendant Kimberly Johnson, but again, he has failed to give the requisite detail about the alleged conversations or show how they contained any statements that constituted alleged fraudulent representations." (citations omitted)). Those allegations are insufficient to inform each Defendant of the nature of their alleged participation in the fraudulent acts. *See Vicom,* 20 F.3d at 778.

Regarding predicate acts (f) and (g), given the above conclusion that there was no breach of contract claim, the undersign cannot extrapolate that there was a fraudulent intent behind Defendants' collection efforts in order to support a claim of wire or mail fraud. *See Sabrina Roppo*, 869 F.3d at 589. The agreement does not suggest that the agreed upon terms of the contract or Defendants' efforts to recoup payments under the contract were based on misleading representations of fraudulent intent. On this basis, those predicate acts cannot support an

---

[13] There is some disagreement among courts about the specificity required for allegations of an entity's identity. Precedent suggests that a plaintiff must allege identities of an entity's officers or representatives. *Vicom, Inc.*, 20 F.3d at 777-78 ("Because fair notice is '[p]erhaps the most basic consideration' underlying Rule 9(b), Wright & Miller, [Federal Practice and Procedure] § 1298, at 648, the plaintiff who pleads fraud must 'reasonably notify the defendants of their purported role in the scheme.'" (first alteration in original) (citing *Midwest Grinding v. Spitz,* 976 F.2d 1016, 1020 (7th Cir. 1992)); *Kruse v. GS Pep Tech. Fund 2000 LP*, 897 F. Supp. 2d 769, 779 (N.D. Ind. 2012) ("Plaintiffs not only fail to identify the entity responsible for making the misrepresentations, they neglect to identify the individual actors who would have conducted business on behalf of those entities so that Defendants are notified of their purported role in the fraud." (citing *Design Time, Inc. v. Synthetic Diamond Tech., Inc.*, 674 F. Supp. 1564, 1569 (N.D. Ind. 1987))). On this basis, all predicate acts would fail, as the allegations involving 24 Capital do not indicate which officer or representative, meaning "who," was involved in the acts. However, other courts have held that a plaintiff need not allege the name of an entity's employee. *See Munster Steel Co. v. Crane 1 Servs., Inc.*, No. 2:16-CV-345, 2018 WL 620382, at \*3 (N.D. Ind. Jan. 30, 2018) ("While the specific identity of the Crane 1 employee or employees responsible for the fraud is not mentioned in the complaint, there is some precedent for the notion that the 'institutional identity' will suffice at the motion to dismiss stage." (citation omitted)). Regardless of the identity allegations, because the allegations collectively fail to reflect the "when," and "how," Plaintiff's mail and wire fraud allegations fail to meet the requirements of Rule 9(b).

allegation of racketeering activity as they are not alleged with the necessary "precision and some measure of substantiation," rendering these allegations unable to satisfy the heightened pleading requirement. *See Menzies*, 943 F.3d at 338.

This leaves predicate acts (d) and (e), which allege that Allayev (not Sankov) submitted a fraudulent affidavit in New York Court. Admittedly, Allayev's affidavit is concerning because it directly contradicts Sankov's earlier affidavit that the latter was Operations Manager at 24 Capital and because Allayev's statement was made under oath and submitted to a court. (*Compare* ECF 27-3 at 1, *with* ECF 27-3 at 3). Nevertheless, this allegation cannot serve as a predicate act of racketeering activity in support of a RICO claim against Sankov and 24 Capital—the only named parties in this lawsuit—without any allegation tying Allayev's alleged intent to engage in fraudulent activity to Defendants' intent to do the same. Thus, Plaintiff likely does not make an allegation of racketeering activity.

2.  <u>Pattern</u>

Next, to demonstrate that a pattern of racketeering activity exists, Plaintiff must show "'at least two acts of racketeering activity' within a ten-year period." *Menzies*, 943 F.3d at 336 (quoting 18 U.S.C. § 1961(5)). In addition, a civil RICO claim "must also satisfy the so-called 'continuity plus relationship' test: the predicate acts must be related to one another (the relationship prong) *and* pose a threat of continued criminal activity (the continuity prong)." *Midwest Grinding Co.*, 976 F.2d at 1022 (alteration in original) (citations omitted); *Menzies*, 943 F.3d at 337 ("To plead a pattern of racketeering activity, a plaintiff must demonstrate a relationship between the predicate acts as well as a threat of continuing activity—a standard known as the 'continuity plus relationship' test." (citation and internal quotation marks omitted)).

"Satisfying the pattern element is no easy feat and its precise requirements have bedeviled courts." *Menzies*, 943 F.3d at 336 (citations omitted).

The relationship prong is satisfied if the acts "'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989) (quoting 18 U.S.C. § 3575(e)). In other words, courts evaluate whether predicate acts are "close in time and character, undertaken for similar purposes, or involving the same or similar victims, participants, or means of commission." *Menzies*, 943 F.3d at 337 (citation omitted).

Here, the complaint does not allege the necessary relationship between predicate acts. The predicate acts alleged against Defendants do not appear to have a similar purpose than those levied against Allayev. To the contrary, the acts undertaken by Allayev seem to be "isolated events." *See H.J. Inc.*, 492 U.S. at 240. Additionally, the predicate acts do not have the same participants. For example, while 24 Capital enters into contracts and Sankov signs an affidavit on 24 Capital's behalf in confessions of judgments, Allayev submits false affidavits in court. As stated before, nothing ties 24 Capital's and Sankov's acts to Allayev's. Further, the predicate acts do not appear to be "close in character," or the same "methods of commission." Entering into a contract and using a provision of the contract to obtain judgment is a far cry from submitting demonstrably false affidavits in federal court. *See H.J. Inc.*, 492 U.S. at 240; *Menzies*, 943 F.3d at 337.

Plaintiff's most compelling allegation of a pattern of racketeering activity is that several other individuals and entities signed a similar MCA with 24 Capital and that they have similarly confessed judgment. (ECF 19-3, 19-4). However, this is not the smoking gun Plaintiff may think it is. Indeed, the MCA appears to be a standard forms contract and as such, while entering into

MCAs may constitute a pattern, it does not constitute a pattern of *racketeering activity*.

Additionally, missing from the complaint is an allegation that Allayev submitted false affidavits

in those cases as well, which, here, is the most pertinent allegation of fraud. Thus, in balance, the

complaint does not allege the necessary relationship to satisfy the pattern prong of a RICO claim.

Even assuming Plaintiff fulfilled the relationship prong, the complaint must fulfill the

continuity prong, that is, it must allege a "threat of continued criminal activity." *See H.J., Inc.,*

492 U.S. at 239. But here, the complaint is deficient in that regard, at least when premised on

allegations of mail and wire fraud.[14] Beside the deficient allegations of mail and wire fraud, the

complaint alleges in passing that Defendants made threats of physical injury through the phone,

which arguably would constitute criminal activity. (ECF 19 ¶ 14). But as discussed in the context

of the racketeering activity analysis, those allegations lacked the specificity necessary under Rule

9(b). (*See id.* (stating "Defendants also telephoned PBE in Indiana and made threats of physical

injury. These telephonic threats were made on or around July 19, 2019.")). Even so, under Rule

8, those barebone allegations would not suffice to appraise Defendants of the complained of

---

[14] It is unlikely Plaintiff would prevail even under a continuity analysis. The Seventh Circuit now evaluates the continuity prong over with reference to the four "*Morgan* factors": "(1) the number and variety of predicate acts and the length of time over which they were committed; (2) the number of victims; (3) the presence of separate schemes; and (4) the occurrence of distinct injuries." *U.S. Textiles, Inc. v. Anheuser-Busch Cos.*, 911 F.2d 1261, 1266-67 (7th Cir. 1990) (citing *Morgan v. Bank of Waukegan,* 804 F.2d 970, 975 (7th Cir. 1986)); *Vicom, Inc.*, 20 F.3d at 780. Courts have repeatedly held that the first factor, the number and variety of predicate acts and the length of time over which they were committed, "is weighed the most heavily." *3BTech Inc. v. Garelick*, No. 3:21-CV-34 JD, 2021 WL 5206100, at *9 (N.D. Ind. Nov. 9, 2021) (citing *Midwest Grinding*, 976 F.2d at 1024; *Vicom, Inc.*, 20 F.3d at 781). Further, in evaluating this factor, the repetition of predicate acts, when based on mail and wire fraud, does not weigh in favor of finding a pattern. *See Hartz v. Friedman*, 919 F.2d 469, 473 (7th Cir. 1990) ("Mail fraud and wire fraud are perhaps unique among the various sorts of 'racketeering activity' possible under RICO in that the existence of a multiplicity of predicate acts (here, the mailings) may be no indication of the requisite continuity of the underlying fraudulent activity." (citing *Lipin Enters. Inc. v. Lee,* 803 F.2d 322, 325 (7th Cir. 1986) (Cudahy, J., concurring))); *Menzies,* 943 F.3d at 338 ("Given the[] heightened pleading standard[] and Congress's insistence that a RICO claim entail a clear pattern of racketeering activity, we have cautioned that 'we do not look favorably on many instances of mail and wire fraud to form a pattern.'" (citing *Midwest Grinding*, 976 F.2d at 1024-25)); *see also Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 475 (7th Cir. 2007) (explaining that the Seventh Circuit has "repeatedly rejected RICO claims that rely so heavily on mail and wire fraud allegations to establish a pattern" (citations omitted)). Here, because Plaintiff alleges predicate acts of wire fraud without particularity, and because the first factor is weighed heavily, Plaintiff's allegations would likely not meet the continuity-prong of the pattern analysis.

conduct. For those reasons, Plaintiff also fails to make a claim that Defendants engaged in a pattern of racketeering activity. In conclusion, I FIND that Plaintiff fails to make a RICO claim under Section 1962(c).

### E. Section 1962(d) RICO Claim

Plaintiff also alleges a violation of Section 1962(d) of the RICO Act, asserting that Defendants engaged in a "four-plus-year-long conspiracy to steal, thieve and purloin from PBE by operating a so-called 'merchant cash advance financing' company . . . ." (ECF 19 ¶¶ 1, 26). "[I]n order to plead a viable § 1962(d) claim, a plaintiff must allege that a defendant agreed to the objective of a violation of RICO." *Goren*, 156 F.3d at 732 (citation and internal quotations marks omitted). Specifically, a plaintiff must allege "(1) that each defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity and (2) that each defendant further agreed that someone would commit at least two predicate acts to accomplish those goals." *Id.* (footnote and citation omitted). "Where a plaintiff has pleaded a RICO violation under 18 U.S.C. § 1962(c), an accompanying RICO conspiracy claim requires that the complaint additionally allege an agreement." *Haddad v. Am. Home Mortg. Servicing, Inc.*, No. 18 C 00731, 2019 WL 1425835, at *7 (N.D. Ill. Mar. 29, 2019) (citing *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011)).

Because Plaintiff has brought a claim under 1962(c), the only element it needs to allege is that an agreement to violate RICO exists. A conspiracy claim under 18 U.S.C. § 1962(d) "may be shown by proof that the defendant, by his words or actions, objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise, through the commission of two or more predicate crimes," *DeGuelle*, 664 F.3d at 204 (citation omitted), allegations which are missing from the complaint. In any event, "[b]ecause the complaint does

not sufficiently allege an enterprise or pattern of racketeering activity, [this Count] is doomed to fail." *Haddad*, 2019 WL 1425835, at *10. As such, I FIND that Plaintiff's conspiracy claim under Section 1961(d) is not viable.

### F. Intentional Misrepresentation

Next, Plaintiff asserts an intentional misrepresentation claim in Count II. Under Indiana law, the heightened pleading standard under Rule 9(b) applies to claims of intentional misrepresentation. *See Buffet Crampon S.A.S v. Schreiber & Keilwerth, Musikinstrumente Gmbh*, No. 3:09-CV-347RM, 2009 WL 3675807, at *17 (N.D. Ind. Nov. 2, 2009) ("[T]o the extent [the plaintiff] asserts claims sounding in fraud—*i.e.*, 'passing off', intentional misrepresentation, etc.—the heightened requirement is triggered . . . .").

The intentional misrepresentation claim is largely predicated on the same facts alleged to support Plaintiff's RICO and breach of contract claims. (*See* ECF 19 ¶¶ 35-38). I concluded that those allegations are not made with sufficient particularity or cannot support Plaintiff's RICO and breach of contract claims, thus, those conclusions apply with respect to the intentional misrepresentation claim as well. Therefore, I FIND that Plaintiff fails to state a plausible intentional misrepresentation claim in Count II.

### G. Fraud

In Count III, Plaintiff alleges that Defendants engaged in fraud when Attorney David Fogel submitted allegedly fraudulent documents "on behalf of Defendants" to Plaintiff's banks, in which Fogel "falsely states PBE resides in New York and conducts business in the State of New York." (ECF 19 ¶ 40). According to the complaint, those "representations are material to the ability of Defendants to lawfully restrain the accounts of PBE," because Plaintiff's banks relied on those statements and restrained its accounts, which caused an interruption in Plaintiff's

ability to operate. (*Id.* ¶¶ 41-43). The complaint also alleges that "David Fogel and Defendants knew at the time of these representations concerning PBE's residence and contacts with the State of New York that these statements were false." (*Id.* ¶ 41). Here, too, the allegations fail to make a fraud claim.

Plaintiff points to Exhibit B as evidence of the submission of fraudulent documents to its banks, but it is unclear what specific document Plaintiff is referring to. (*See id.* ¶ 14 (citing ECF 19-2)). Exhibit B contains (1) a letter from Fogel sent to Partners 1st Federal Credit Union ("Partners First"), with an attached UCC Financing statement, (2) a document titled "information subpoena with restraining notice" ("subpoena") with an attached exemption notice, (3) an exemption claim form, and (4) a document titled "questions and answers in connection with information subpoena." (ECF 19-2).[15] The only document making mention of a party residing in New York is the subpoena, stating that "the person to whom this subpoena is directed; resides; is regularly employed; has an office for the regular transaction of business in person; in the State of New York." (ECF 19-2 at 4). The subpoena further reflects that it is directed to Partners First (*id.*), thus implying that Plaintiff's bank resides or regularly employs individuals or has an office for the regular transaction of business in New York—not Plaintiff. All other documents submitted to Plaintiff's banks, to the contrary, show that Defendant 24 Capital, via David Fogel, represented Plaintiff's address to be in Fort Wayne, Indiana. (*Id.* at 3, 4). As such, I FIND that Plaintiff's allegations in Count III fall short of making a plausible fraud claim.

*H. Misappropriation of Name and Goodwill*

Lastly Plaintiff brings forth a misappropriation of name and goodwill claim in Count V. But this claim fares no better than Plaintiff's other claims.

---

[15] While Plaintiff alleges that Defendants submitted fraudulent documents to Partners First and PNC Bank (ECF 19 ¶ 40), Exhibit B only shows documents submitted to Partners First.

The Indiana Supreme Court has recognized that "an appropriate remedy for the misappropriation of a corporation name or likeness is found under the state unfair competition law and trademark statutes, as well as common law torts unrelated to notions of privacy, such as tortious interference with business relations." *Felsher v. Univ. of Evansville*, 755 N.E.2d 589, 598 (Ind. 2001). The parameters of an unfair competition claim are murky:

> [u]nfair competition . . . does not describe a single course of conduct or a tort with a specific number of elements; it instead describes a general category into which a number of new torts may be placed when recognized by the courts. The category is open-ended, and nameless forms of unfair competition may be recognized at any time for the protection of commercial values.

*Id.* (citation omitted). Nevertheless, the Supreme Court of Indiana instructs courts to ask whether "the name or mark used by defendant has previously come to indicate and designate plaintiff's goods, or to state it another way, whether defendant, as a matter of fact, is by his conduct passing off his goods as plaintiff's goods, or his business as plaintiff's business." *Id.* (citation omitted).

Plaintiff alleges in barebones fashion that "[t]hrough its unauthorized contact with [Partners First] and PNC under the guise of a legitimate creditor, Defendants misappropriated PBE's public name, persona, and goodwill to raise the unauthorized funds," and that "PBE is entitled to recovery of all funds raised by Defendants in PBE's name." (ECF 19 ¶ 48). However, nothing in Plaintiff's complaint indicates that Defendants attempted to pass off as Plaintiff. Put differently, at no moment were Defendants attempting or pretending to represent themselves as Plaintiff. Rather, the complaint suggests that Defendants represented themselves to Plaintiff's banks as creditors under the contract. And Plaintiff does not plead an alternative basis under the broad umbrella of unfair competition that could salvage its misappropriation of name and goodwill claim.

Thus, however broad unfair competition may be, Plaintiff does not develop its misappropriation claim to fulfill the requirement of notice pleading under Rule 8, and I FIND that the misappropriation of name and goodwill claim in Count V also fails to state a claim.

### III. RELIEF REQUESTED

#### A. Damages

Plaintiff requests the following damages: (1) compensatory damages, interests, costs, and attorney fees in excess of $75,000 for its breach of contract claim, (2) over $75,000 in damages, treble damages, costs and attorney fees for its RICO claims, (3) compensatory and punitive damages, interests, costs and attorney fees for its fraud and misrepresentation claims, and (4) "recovery of all funds raised by Defendants in PBE's name," under its misappropriation of name and goodwill claim. (ECF 19 ¶¶ 34, 44, 48, 53-54). As concluded *supra*, Plaintiff's complaint fails to plead any plausible claims, and thus, it is not entitled to a default judgment on any of these bases. Consequently, I FIND that Plaintiff is not entitled to any monetary damages in connection with its motion for default judgment.

#### B. Disgorgement[16]

Plaintiff's complaint alleges that "[t]o the extent Defendants breached fiduciary duties owed to PBE, PBE is entitled to disgorgement of any amounts realized by Defendants by reason of their breach." (ECF 19 ¶ 46).

To obtain disgorgement, Plaintiff must show that it suffered from a breach of fiduciary duty. *West v. J. Greg Allen Builder, Inc.*, 92 N.E.3d 634, 645 (Ind. Ct. App. 2017); *see also*

---

[16] Rather than request disgorgement as a form of relief, Plaintiff brings a claim for disgorgement in Count IV. (ECF 19 ¶¶ 45, 46). Disgorgement is "an equitable form of relief." *State ex rel. Ind. State Bar Ass'n v. United Fin. Sys. Corp.*, 926 N.E.2d 8, 18 (Ind. 2010) (citations and internal quotation marks omitted). Therefore, the disgorgement claim in Count IV is more appropriately considered in the context of the relief requested.

*Wenzel v. Hopper & Galliher, P.C.*, 830 N.E.2d 996, 1001 (Ind. Ct. App. 2005). However, neither the complaint, nor Plaintiff's motion for default judgment, spell out the basis for a fiduciary duty owed by Defendants to Plaintiff, nor the basis for the breach of any existing fiduciary duty. Indeed, if Defendants owed a fiduciary duty to Plaintiff,[17] and having concluded that Defendants did not breach the contract, it is unclear how Defendants would have breached their fiduciary duty as Count IV "fails to allege any duty apart from or independent from the duties associated with the contract." *Curtis v. Berutti*, 176 N.Y.S.3d 423, 433 (N.Y. Sup. Ct. 2022) (citation omitted) ("[C]laims for breach of fiduciary duty that are based on the same allegations as claims for breach of contract must be dismissed as duplicative." (citations omitted)). Count IV does not apprise Defendants of the basis for such request for relief, and I FIND a default judgment based on the disgorgement claim in Count IV to be inappropriate.

## V. CONCLUSION

For the foregoing reasons, the undersigned Magistrate Judge RECOMMENDS that Plaintiff's motion for default judgment (ECF 27) be DENIED.

The Clerk is directed to send a copy of this Report and Recommendation to Plaintiff's counsel and to Defendant 24 Capital LLC, 20200 W. Dixie Highway, Suite 908, Miami, FL 33180, and Defendant Jason Sankov, c/o Lisa Sohum, Authorized Agent, 20200 W. Dixie

---

[17] Arguably, the contract could suggest that a fiduciary exists as it states that Plaintiff "irrevocably appoints 24 CAPITAL, as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to 24 CAPITAL. . . ." (ECF 19-1 at 3). But this contract provision, which seems to apply only once Plaintiff has defaulted, conflicts with New York's conception of fiduciary duty, which "generally must arise out of a relationship of confidence, trust, or superior knowledge or control, and may exist where one entity is under a duty to act for or to give advice *for the benefit of another* upon matters within the scope of the relation." *Broadway Nat'l Bank v. Barton-Russell Corp.*, 585 N.Y.S.2d 933, 945 (N.Y. Sup. Ct. 1992) (emphasis added) (citations and internal quotation marks omitted). Under this definition, there can be no fiduciary duty where the creation of the contract benefits Defendants rather than Plaintiff, as made clear by the fact that the fiduciary duty would apply "to settle obligations due to 24 CAPITAL." Additionally, the complaint's allegations suggest that Defendants acted according to the provision as it tried to settle the obligations Plaintiff owed to Defendants, thus challenging the contention that they would have breached their duty.

Highway, Suite 908, Miami, FL 33180. Fed. R. Civ. P. 72(b). NOTICE IS HEREBY GIVEN that within fourteen days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings or recommendations. Fed. R. Civ. P. 72(b). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER. *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995); *Egert v. Conn. Gen. Life Ins. Co.*, 900 F.2d 1032, 1039 (7th Cir. 1990).

Entered this 14th day of February 2024.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge